No. 44,617

BRIAN KENT MORRIS, a minor, by Harold Morris, his father and next friend, *Appellant,* v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, a corporation, Appellee.

(422 P. 2d 920)

Opinion filed January 21, 1967.

C. K. *Sayler,* of Topeka, argued the cause and *David H. Fisher, Donald Patterson, Jack L. Summers* and *Edwin D. Smith,* all of Topeka, were with him on the brief for the appellant.

W. E. *Treadway,* of Topeka, argued the cause and *C. J. Putt, J. B. Reeves* and *Roth A. Gatewood,* all of Topeka, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRICE, C. J.: This was an action to recover for the loss of an arm and a leg when plaintiff was run over by a car of defendant railway company.

The trial court sustained defendant's motion for summary judgment on the ground that at the time and place in question plaintiff was a trespasser on the tracks of defendant and that there was no evidence whatsoever of any willful or wanton act on the part of defendant's employees which caused the injury.

Plaintiff has appealed from that ruling.

In rendering judgment the trial court filed a memorandum decision which states succinctly (1) rules applicable to consideration of a motion for summary judgment; (2) the facts as shown by affidavits, depositions, admissions and answers to interrogatories; (3) rules of law applicable to the facts shown, and (4) the reasons for the decision.

Because all issues are thoroughly analyzed and discussed in the trial court's memorandum—we quote it in full:

"MEMORANDUM DECISION

"This is an action brought by Brian Kent Morris, a minor now 18 years of age by his father and next friend against the Atchison, Topeka and Santa Fe Railway Company to recover damages for extremely serious personal injuries suffered by the plaintiff when he was run over by one of the defendant's railroad cars.

"A motion was filed by the defendant for summary judgment pursuant to K. S. A. 60-256. On November 12, 1965, the motion was argued and taken under advisement on written briefs to be submitted by counsel. Written briefs have now been received. In determining this motion the Court has considered the following affidavits and depositions which were introduced into evidence by the parties in connection with the motion:

"1. The affidavit of David W. Calwell with statements of plaintiff and the only two witnesses to plaintiff's accident attached thereto.

"2. The affidavit of W. T. Richardson.

"3. The affidavit of C. A. Holcome with exhibit.

"4. The affidavit of David W. Calwell with attached photographs.

"5. The affidavit of David W. Calwell with copy of plat of the area.

"6. The affidavit of A. F. Ewart, Division Engineer of the defendant railway company with an engineer's drawing of the Emporia railroad yard.

"7. The affidavit of E. Blaine Gregory, Engine Foreman of the Atchison, Topeka and Santa Fe Railway Company.

"All of the above affidavits are attached directly to the motion for summary judgment which was filed by the defendant.

"In addition to this the Court has considered the affidavit of Russ B. Anderson, two affidavits of Brian Kent Morris, and the affidavit of C. K. Sayler, all of which were furnished by counsel for plaintiff. In addition to this the Court has considered the deposition of Philip Holliday taken on behalf of the defendant for discovery purposes on September 9, 1965, and also the deposition of the plaintiff Brian Kent Morris taken on behalf of the defendant for discovery purposes on September 9, 1965. The Court has further considered the interrogatories to be answered by plaintiff together with the answers filed in response thereto and also the admissions of the defendant in response to plaintiff's requests for admissions, and also the interrogatories submitted to the defendant and the defendant's answers in response thereto. The matter is now ready for decision.

"DECISION OF THE COURT

"It is the order of this Court that the defendant's motion for summary judgment be sustained and that summary judgment be entered in favor of defendant for its costs.

"RATIONALE OF THE DECISION

"As the Court understands it, the purpose of a motion for summary judgment under K. S. A. 60-256 is to bring about an expeditious disposition of litigation without needless waste of time in trial formality where there is no

bona fide issue of fact in dispute. The Court recognizes the following rules which should be applied in the consideration of a motion for summary judgment:

"1. On a motion for summary judgment the record including the evidentiary matter presented, must show beyond controversy that the allegations of the pleading need not be taken as true; and all doubts are resolved against the movant.

"2. If it appears from the pleadings and evidentiary matter presented that the Court would be compelled to direct a verdict for the defendant, a motion for summary judgment should be granted, not otherwise.

"3. On consideration of a motion for summary judgment the trial court may not consider credibility or weight of evidence and all doubts are resolved against the moving party.

"4. Summary judgment is an extreme remedy and should be granted only where the truth is not left in doubt. To justify such a judgment there must remain no bona fide issue of material fact.

"5. In considering a motion for summary judgment the court may not choose between conflicting possible inferences. It is not a substitute for the trial of issues of fact by court or jury.

"6. K. S. A. 60-256 relating to summary judgments should be cautiously invoked to the end that parties may always be afforded a trial where there is a bona fide dispute of facts between them.

"With the above rules in mind and interpreting all of the evidentiary matters now before the Court in a manner most favorable to the plaintiff and against the defendant movant, the undisputed facts in this case are clearly as follows:

"On July 20, 1964, the plaintiff Brian Kent Morris was 17 years of age. He had recently graduated from Emporia High School in Emporia, Kansas. He had been employed about three weeks before this date by the Anderson Cattle Company to unload hay off of trucks into a hay barn and perform other miscellaneous work on the Anderson Cattle Company premises on property located just outside the city limits of Emporia, Kansas. The defendant Santa Fe owned a yellow colored hay barn which was located on a tract of land owned by the Santa Fe and which constitutes a part of the Emporia Yards of the Atchison, Topeka and Santa Fe Railway Company. The hay barn in question is painted the same color as the yard office of the Santa Fe. There was no fence dividing up any part of the premises and there is direct access from the hay barn to the siding tracks, stockyard, and the stockyard office. In 1961 the hay barn in question was leased by the Santa Fe to the Anderson Elevator Company. A copy of this lease is dated December 1, 1961, is attached to the affidavit of C. A. Holcombe. Attached to the lease is a scale drawing of the general area around the Santa Fe yards and shows with particularity the location of the leased premises. The lease provides that the lessee Anderson shall use the premises exclusively for storing hay which will be ultimately purchased by the lessor. Both before and after July 20, 1964, the Santa Fe purchased hay out of the hay barn from Anderson for use in feeding cattle being shipped by the Santa Fe Railroad. The Anderson Cattle Company employees

would periodically drive trucks to the barn and unload the hay from the trucks and unload it into the barn. The Santa Fe employees, of course, were familiar with this arrangement.

"The testimony of the plaintiff Brian Kent Morris and the witness Philip Holliday shows that on the date of plaintiff's injuries, July 20, 1964, they were employed by the Anderson Cattle Company to unload hay from the trucks into the Santa Fe barn. Several days before the date of plaintiff's injury employees of the Santa Fe had come to the hay barn and one of them told the two boys to get away from the barn if they wanted to smoke. It is clear from the statements and from the evidence that the plaintiff and Philip Holliday had been at the barn unloading hay from the trucks into the barn for several days. On July 20, 1964, the day was extremely hot and apparently the barn was practically loaded with hay. The plaintiff and two of his co-workers, Philip Holliday and John Davis, were waiting for other trucks to bring more hay and they decided to get in the shade. The evidence is undisputed that they walked a distance of approximately 285 feet down a path to the tracks of the Santa Fe and proceeded to get underneath one of the Santa Fe railroad cars. The two boys, Philip Holliday and John Davis, are about the same age as the plaintiff. The plaintiff Brian Kent Morris testified that prior to July 20, 1964, he had never left his place of work at the hay barn to go to any standing cars on the railroad track; he further testified in his deposition that he had never crawled under a railroad car before nor had he ever seen anyone else crawl under a standing car before the afternoon of July 20, 1964. He further testified that he and the other two boys followed a path to the location of the railroad cars. The cars in question were flat cars used for the hauling of welded rails. The plaintiff Brian Kent Morris testified that when he crawled underneath the car, he looked to see whether or not there was a locomotive attached to the cars but that he did not see any. In response to a question on page 24 of his deposition he stated that he did not know whether he could have seen a locomotive had there been one attached to the cars, that there was a slight curve in the track which made it difficult for him to see a locomotive at the other end of the cars. He further testified that none of the three boys went to a point from which they could see the other end of the cars. He further testified in his deposition that he couldn't remember whether anything was said about whether the cars might move while they were under them and he did not know whether any of the three were keeping a lookout for the movement of the cars. Plaintiff crawled under the car and from there he could see the hay barn. The plaintiff lay underneath the car with his legs across the north rail and his head on the rail on the south. The plaintiff is a tall boy, being six feet four inches in height. The other two boys also took positions underneath the car. Plaintiff testified that as he was lying underneath the car his body was about five feet from the nearest wheels of the car and could possibly have been less. While the boys were under the car a switch engine which was attached at the other end proceeded to move the cars. One of the boys rolled out from underneath the tracks and one of the boys lay down between the tracks. They were not injured. Plaintiff Brian Kent Morris was unable to get to a point of safety and his body was run over by the railroad car with the result that he lost an arm and a leg.

"In answers to interrogatories the plaintiff stated the facts to be in part as follows:

"In answer to Interrogatory No. 5 plaintiff stated in substance that all of the duties of his employment consisted of unloading hay from trucks and stacking the same in the barn.

"In answer to Interrogatory No. 11 by which plaintiff was asked why did he go beneath the car on July 20, 1964, he answered, 'For shade.'

"In answer to Interrogatory No. 13 he stated that he had been beneath the car a period of 15 to 20 minutes at the time of his injury. During this period he had been, 'Just lying there.' (Interrogatory No. 14.)

"In answer to Interrogatory No. 16 the plaintiff stated that his head was on one rail and his feet were on the other. In his deposition at Pages 20 to 22 the plaintiff testified that he crawled beneath the defendant's railroad car where he assumed a reclining position with his arm over one rail and his legs over the other rail about five feet from the nearest wheel. The undisputed facts clearly show the defendant's employees had no actual knowledge of the plaintiff's presence beneath the car. In Interrogatory No. 28 plaintiff states that he did not see any employee of the railway company on or about the cars before he went under the car. In Interrogatory No. 29 plaintiff stated that he did not see any employee of the railway company on or about the cars while he was under the car. In Interrogatory No. 30 the plaintiff stated that he did not see any employee of the railway company about the cars after his injury and before he was removed from the place of his injury. On page 26 of the plaintiff's deposition he testified that he does not know of anyone who knew that the three boys were under the car before the injury. Philip Holliday in his deposition on page 18 testified that he didn't see any person or anyone about anywhere along the cars before they crawled under the car or while they were under the car and that there wasn't anybody who knew that the three boys were under the car before the car moved. The same fact is brought out by the affidavit of E. Blaine Gregory, engine foreman, which is attached to the motion for summary judgment.

"The undisputed facts in the case also show that the car which injured plaintiff was moved by the defendant on its tracks during a switching operation. See the affidavit of E. Blaine Gregory. The evidence is undisputed that 35 railroad cars were coupled to the switch engine at the time the cars were moved. The train car which injured plaintiff and the car to which it was attached had been sitting on the location where they were when plaintiff was injured a period of 12 days. In defendant's answers to plaintiff's interrogatories, the defendant admits that no employee of the defendant came to the rear of the cars before the switching movement and that the switch engine was connected to the cars a few minutes before the movement and further that the switch engine did not give any signal prior to moving the train and car which struck the plaintiff and further that no railroad employee made any type of inspection along or under the train cars attached to the car which injured plaintiff prior to said train cars being moved. From the evidentiary matter before the Court it is clear that the tracks upon which the plaintiff was injured was a railroad storage track and were a part of the Emporia yards of the Santa Fe. The distance from the hay barn to the car by which the

plaintiff was injured was 285 feet. The answers of the defendant to plaintiff's interrogatories further show that the type of couplers between the cars consisted of type E couplers, top operated, with spacer blocks placed between horn and buffer block to minimize slack action between cars for the transportation of continuous welded rail; but they did not eliminate noise produced by moving cars. One of the boys testified that the train started off fast just like a car with an automatic transmission.

"In his deposition Philip Holliday testified that none of the boys had ever gone under any cars before but that they had leaned against some box cars which were located on the same spur track but *right next to the barn.* (Page 12 and 13.) In regard to these cars Holliday testified that they were not attached to any part of a string of cars. In regard to looking for a locomotive at the other end of the car on Page 16 of the transcript Holliday testified that he looked to see whether or not there was any locomotive attached to the cars and he looked as far as he could see but the tracks angled to the northwest and curved but as far as he could see there was nothing but cars. He saw no engine attached to them. He further testified that from his observations he could not tell whether or not there was a locomotive attached to the car. He further testified that there were some conversations as to whether there was a locomotive attached to the car, but then Davis and he had both seen the cars there previously and they said to each other they had been there the whole week and wasn't much chance of one being there since they were parked there that long. He further testified that after they got under the cars they discussed that even if there were a locomotive, they would be able to move before it takes off because at the time you know, most freight trains, when they take off, when they start, by the time each of the cars pull tight, there's a lot of noise, a lot of movement. (Page 17.) As pointed up above it is undisputed that a signal was not given by the train crew before moving the freight cars. According to the affidavit of W. T. Richardson, Rules Examiner, which is attached to the motion for summary judgment, Rule 84 of the Operating Department of the railroad declares:

> " 'A train must not start until the proper signal is given. A train must not be backed until proper signal has been given from the rear end.'

"He further states in his affidavit that under the rules of the Operating Department yard engines with or without cars in yard service and within yards are not considered to be trains. And it is only when one or more engines with or without cars are equipped with *markers* and are authorized as trains that they become trains within the rules of the Operating Department. He further states that an engine moving cars from a storage track to be left upon another track all within the Emporia Yards constitutes a switching operation and not a train movement and that in such a situation no signal is required before a movement of cars from track to track within the yards by a yard engine.

"The above facts are not in dispute in this case and the court assumes that all of these facts will be proved or could be proved at a trial of this case on its merits before a jury.

"On this motion for summary judgment this Court is required to determine whether or not it can be held as a matter of law that the defendant is

not liable to the plaintiff for his injuries. The defendant in substance argues that the status of the plaintiff at the time of the injury was a trespasser as a matter of law and there being no evidence or contention that the plaintiff was willfully or wantonly injured by the defendant, then the defendant is entitled to judgment. In its motion for summary judgment defendant also contends that there is no genuine issue of fact existing whereby a Court or jury could not find the plaintiff guilty of contributory negligence barring his recovery.

'There being no allegation or claim or evidence that the Santa Fe's employees were guilty of willful or wanton negligence, the question of law to be determined is basically this:

"What was the status of the plaintiff at the time of his injury by the railroad car of the defendant which determines the extent of the duty owed by the defendant to the plaintiff?

"In the first instance it would seem important to consider the obligation owed by a landowner to persons upon the premises depending upon the status of the person who is injured.

"1. *Business invitee.* The owner or occupant of premises owes a much higher degree of care to avoid injury to an invitee than to a mere licensee. The owner or occupant of premises is liable to an invitee for injuries resulting from failure to exercise reasonable or ordinary care for the invitee's safety. The duty to exercise ordinary care is active and positive and no element of willfulness or wantonness need be present. An inviter has the duty to protect an invitee against any danger that may be reasonably anticipated. The owner or occupant of premises is charged with the duty of exercising reasonable care to keep the premises in a reasonably safe and suitable condition so as to avoid injury to an invitee or and to warn an invitee of concealed perils the existence of which the owner or occupant knows or should know by the exercise of reasonable diligence. *Graham v. Loper Electric Co.*, 192 Kan. 558, 389 P. 2d 750. An invitee is a person who goes on the premises of another in answer to an express or implied invitation of the owner or occupant on the business of the owner or occupant or for their mutual advantage.

"2. *Licensee.* As a general rule a person is a licensee as that term is used in the law of negligence where his entry or use of the premises is permitted expressly or impliedly by the owner or person in control thereof or by operation of law. A license implies permission or authority and is more than mere sufferance but generally it does not imply an invitation. A licensee therefore occupies a position somewhere between that of a trespasser and that of an invitee. A licensee broadly defined is a person who enters upon the property of another for his own convenience, pleasure or benefit. At common law a landowner is liable to a licensee only for injuries to the licensee which were the result of the landowner's willful or wanton negligence. This rule is often expressed as "the only duty an owner or occupant of premises owes to a mere licensee is the duty to refrain from willfully, intentionally, or recklessly injuring him." See *Steinmeyer v. McPherson*, 171 Kan. 275. The same rule is stated in *Backman v. Vickers Petroleum Co.*, 187 Kan. 448, 357 P. 2d 748, and also in the very recent case of *Graham v. Loper Electric Co.*, 192 Kan. 558. In the Graham case on Page 561 the statement is made:

" 'Negligent injury of a licensee will not create a cause of action unless it is equivalent to willfullness or wantonness.'

"There is an excellent case note on this subject in 12 Kansas Law Review 571. The more recent cases severely criticize the common law rule of lia- bility with respect to a licensee and the modern cases now generally recognize a distinction between cases involving injury from the *active* negligence of the landowner and cases of injury resulting from a physical condition of the premises. Under this view the landowner is liable for failure to exercise ordinary care to a licensee whose presence is known or reasonably could have been known when the injury results from *active* misconduct. In the case of *Montague v. Burgerhoff*, 150 Kan. 217, 92 P. 2d 98, the Supreme Court recog- nizes the more modern view and the active negligence theory and in that case followed a rule that if the owner is *affirmatively* and *actively* negligent causing injury to a licensee, the owner will be liable for injuries sustained as a result of such active and affirmative negligence. This case has apparently not been cited or applied since it was decided in 1939. In the more recent cases, *Blackburn v. Colvin*, 191 Kan. 239, 380 P. 2d 432, *Hogan v. Hess Construc- tion Co.*, 187 Kan. 559, and *Graham v. Loper Electric Co.*, 192 Kan. 558, 389 P. 2d 750, the distinction between passive and active negligence is not made clear. In fact the language in the Graham case would seem to restrict the liability of the owner or occupant of premises to the duty only of not will- fully or wantonly injuring a licensee.

"3. *Trespassers.* In the law of negligence a trespasser is a person who enters on the property of another without any right, lawful authority or an express or implied invitation or license. 65 CJS Negligence Section 23. The law also seems to be clear that a licensee or invitee who goes *beyond* the rights and privileges granted by the license becomes a trespasser. Thus, a person who is invited or permitted to enter a particular part of the land becomes a trespasser if he enters another part of the land. Where a person while lawfully on the property of another or on public property as an invitee leaves that portion of the property on which he has been invited, or uses the property on a venture in his own interests and not within the scope of his original invitation or purpose, he loses his status as an invitee and becomes a trespasser. 65 CJS Negligence Section 23 at Page 437. For example in Kansas the rule which requires the proprietor of a business which is open to public patronage to use ordinary care to make the premises reasonably safe for customers is generally limited to that part of the premises designed, adapted, and prepared for the accommodation of customers, or to which customers may reasonably be expected to go. It does not require the proprietor to render safe for use parts of the premises reserved for use only by the proprietor and his employees. *Thompson v. Beard and Gabelman, Inc.*, 169 Kan. 75, 216 P. 2d 798. The Thompson case is certainly a recognition of the general rule cited in C. J. S. that a licensee or invitee who goes beyond the rights and privileges granted by the license or invitation becomes a trespasser.

"Throughout the Kansas reports the decisions of the Supreme Court have made it extremely difficult for a person struck or run over by a train to recover from the railroad company. An example is *Wilson v. Railway Company*, 66 Kan. 183, decided in 1903. The plaintiff a bright intelligent boy, twelve

years of age, climbed upon a freight-train consisting of about twenty cars, belonging to the Atchison, Topeka & Santa Fe Railway Company, passed over the top of a car to the other side of the train and dropped off that car and undertook to mount another. When he missed connection the car ran over his foot and crushed it. As he was going across the car he saw a brakeman on top of the train who looked toward him and smiled and said nothing and no one ordered him or his companions to leave the train. In the opinion the Supreme Court points out that the fact that plaintiff and other boys had previously jumped on and off the cars of the company without remonstrance from the employees of the company, did not amount to an invitation from the company to plaintiff to hop on and off its moving trains thereafter, or make the company liable. The Court recognizes the general rule that a railroad company owes no duty to trespassers who jump on and off its moving trains for the purpose of stealing rides, except not recklessly or wantonly to injure them after their peril is discovered.

"The case of *Carey v. Railway Co.*, 84 Kan. 274, which was cited by the defendant in its brief is quite similar to the case at bar. In that case it should be noted that a number of workmen were employed in uncovering rock in a quarry operated by the railroad company, their duties not involving loading or handling the cars; several loaded cars awaiting removal were standing upon a spur track near where they were at work; on account of a rain all but one of them entered the cars; he took shelter beneath a car, and was run over and killed when a freight train backed into the cars in the process of picking them up. The jury found that the railroad company was negligent in failing to give proper warning of the approach of the train. In the Carey case it appeared that the deceased was actually employed by the railroad company as a workman in the stone quarry. On appeal the Supreme Court set aside the jury verdict, held that the defendant owed no duty to the deceased to give a warning of the approach of the train and that his own conduct constituted negligence as a matter of law. On page 277 of the opinion it should be noted that the contention was made on behalf of the widow of the deceased workman that the evidence was sufficient to justify a finding that the company's employees were guilty of misconduct amounting to wantonness in failing give a warning of the approach of the train, since two of them knew that men were in or about the cars to be picked up. The Supreme Court in this regard states:

> " 'We do not think the fact that the trainmen saw a workman in one of the cars, and heard the voices of others, was sufficient to suggest to them the probability of anyone being under the cars or in a similar position.'

"The case of *Hayden v. Railway Co.*, 87 Kan. 438, is cited by the defendant in its brief. In the Hayden case plaintiff Hayden was an employee of contractors who were constructing a dike near the track of the railway company. It was raining and Hayden sought the shelter of a car and sat himself under it proceeding to eat his lunch. The track was one on which were placed cars that were to be cleaned, and quite a number of cars were already on the track. While he was in the position mentioned the switch crew, without any knowledge that he was in a place of danger, placed another car on

that track, and the impact of the switched car against the others pushed the wheels of the car under which he was sitting upon his arm and he was pinned to the track for more than thirty minutes before he was released. The Supreme Court points out that being a trespasser and grossly negligent in sitting down on the railway track under a car, the railway company certainly owed him no duty until they learned of his situation. Until that time they were not bound to take any precautions to avoid injuring him nor to make any provisions for possible trespassers should they happen to be injured. Another case cited by the defendant is *Burgess v. The Atchison, Topeka & Santa Fe Railway Company,* 83 Kan. 497. It appeared that the plaintiff boarded one of the defendant's trains which did not stop at Raymond, Kansas. When about two miles from Raymond the conductor asked him for his ticket. · He had none. When he told the conductor that he wanted to stop at Raymond and would pay cash fare he was informed that he could not stop the train at that place, and that he must get off. The train was stopped and he was ejected. The plaintiff was intoxicated to the extent of being stupefied and drowsy. He was left by the side of the track, and he attempted to follow the train, afoot, on the track. · After walking a short distance he sat down on the end of a tie, and was soon overcome with a stupor. While in this condition a train passed along and struck his side, severely injuring him. On page 499 of the opinion the Supreme Court states:

> " 'It must be remembered that when a person is upon a railroad track without leave, and has no business with the company, such person is a trespasser, and the company owes him no duty except not wantonly to injure him. It is not pretended here that the company was recklessly or wantonly negligent in this case. In the absence of such a degree of negligence the plaintiff has no cause of action, and should not recover a judgment.'

"The rule of the Kansas cases cited above is not unusual to Kansas. The general rule in regard to the obligation of railroads towards persons on their tracks is set forth in 44 American Jurisprudence, Railroads. For example in Section 430 we find the following statement of law:

> " 'The general rule that a railroad company owes no duty of care toward trespassers and bare licensees applies fully to trespassers and mere licensees upon the cars of the company. The only duty a railroad company owes to such persons riding on its train is the negative duty not to injure them wantonly or willfully after discovering that they are on the train.'

"In Section 431 the general rule is stated covering situations where a person is injured while attempting to pass under or between standing cars in a railroad yard. The rule is stated as follows:

> " 'Ordinarily, a person who is injured while attempting to pass under or between standing cars in a railroad yard is a trespasser for whose safety the trainmen owe no duty of care in the absence of knowledge of his presence, and in the absence of such knowledge, no liability is incurred by the railroad company for his injuries. There is generally no reason for the train crews to anticipate the presence of persons crossing

the track between cars of a train. Thus, due care ordinarily does not require trainmen to look under stationary freight cars on a switch before moving them, to ascertain whether someone is sitting on the rails. Accordingly the railroad company is not guilty of negligence where persons are injured while under or between cars without knowledge of the train employees, even though the railroad company knew that persons frequently cross at such points. In any case, it is said that only express consent will serve to license a thoroughfare across a train. Where, however, the injured person was not a trespasser, as where the cars were standing on a track laid in a public highway, or where the injured person was using a gap between cars customarily placed so that openings were left for persons to pass through on the way to and from the station, the railroad company may be liable in the absence of due care.'

"In regard to the obligation of railroad companies to persons on its tracks, the general rule stated in Section 436 of 44 American Jurisprudence, Railroads:

" 'Railroad companies have the right to a clear track in the prosecution of their business, and hence the law does not sanction the use of railroad tracks as a highway for pedestrians. In determining whether the railroad company has violated a duty owing toward a person injured on its tracks, it must be borne in mind that a railroad track is not constructed for pedestrians; and when they use it, either as trespassers or by invitation, they use it in its character of a railroad track, and not as a sidewalk or pavement made of asphalt or concrete, for the use of pedestrians. As in the case of the owner or proprietor or premises generally, the general rule is that one who is on a railroad company's right of way and at a point other than on a highway or at any other authorized crossing, without authority and for no purpose connected with the interests of the railroad company, has the status of a trespasser and is entitled only to the protection accorded one of that status, namely, that the railroad company owes him no duty except to refrain from willful or wanton injury to him, or to take ordinary care not to injure him *after* he is discovered in a position of peril. If his injury results from ordinary negligence on the part of the railroad company before his peril is discovered he cannot recover, there being no duty of maintaining a lookout to discover his presence, but if those in charge of a train deliberately run down a trespasser in full view on the tracks the railroad company is liable, since the injury resulted not from negligence but from willful or wanton conduct.'

"Having stated the principles of law which are applicable to a decision in the instant case, let us turn to the facts of the present case to see where the plaintiff stands. It is clear from the undisputed evidence in this case that the plaintiff was not run over by the defendant's train at any public crossing or at a point in the immediate vicinity of the hay barn where the plaintiff as an employee of the Andersons might be required to go for the purpose of unloading hay trucks. According to the answers of plaintiff to interrogatories submitted to him by the defendant, the only duty of plaintiff's employment was to unload hay from the trucks and to stack the same in the

barn. (Answer to Interrogatory No. 5.) The evidence is undisputed that the plaintiff and the other two boys walked down a path to a point 285 feet from the barn and completely outside of the area of the hay barn or the area adjacent thereto necessary for the purpose of unloading hay. Plaintiff by his own deposition and answers to interrogatories makes it clear that he went beneath the railroad car on July 20, 1964, for his own purpose, to wit: to obtain shade from the sun, and that his duties to his employer Anderson Cattle Company in no way required his presence in the vicinity of the railroad cars. In the opinion of this Court the acts of the plaintiff falls within the rule discussed above that a licensee who goes beyond the rights and privileges granted by the license becomes a trespasser. In the Carey case mentioned above which is found in 84 Kan. 274, the injured workman was an actual employee of the railroad company in a quarry. He took shelter beneath the railroad car for the purpose of getting out of the rain. In the instant case the plaintiff Brian Kent Morris was not even an employee of the railroad company and was clearly beyond the area of the hay barn which had been leased to the Anderson company. The duty owed to the plaintiff in the instant case certainly could not be greater than the duty owed to plaintiff in the Carey case. There is no evidence whatsoever in the instant case that there was any habitual or usual practice of persons to go in the vicinity of railroad cars on the Emporia Yards; there is no evidence in the case that the area where the plaintiff was injured constituted a place of travel or crossing for persons on the railroad yards and where persons might be expected to be found.

"In view of the entire record of this case this Court is compelled to hold that the plaintiff Brian Kent Morris was a trespasser on the tracks of the Santa Fe Railway Company and that the only duty owed to him by the railroad company was not to willfully or wantonly injure him. There is no contention in this case nor is there any evidence whatsoever of any willfulness or wanton act on the part of defendant's employees which caused injury to the plaintiff. In view of this situation the defendant's motion for summary judgment is good and judgment should be entered in favor of the defendant. By reason of the questions of law determined in this case it is unnecessary for the Court to determine the issue of defendant's negligence, plaintiff's contributory negligence or the application of the doctrine of last clear chance. It can be stated that ordinarily the doctrine of last clear chance is applied only where the plaintiff is in a position of peril from which he cannot extricate himself. In the instant case the undisputed evidence is that neither the train crew nor any of the Santa Fe employees had any knowledge of the plaintiff's presence underneath the train and it appears that at all times the plaintiff was in the position where he could have removed himself from his dangerous position under the railroad car. The motion of defendant for summary judgment has been sustained this date and judgment has been entered effective this date in favor of the defendant for its costs. Counsel for defendant is requested to prepare an appropriate journal entry in accordance with the judgment of the Court.

"Dated this 28th day of December, 1965."

In this appeal plaintiff makes four contentions—three of which are argued together. They are that the trial court erred (1) in

holding that plaintiff was a trespasser on the tracks and that defendant's only duty to him was to refrain from willfully or wantonly injuring him; (2) in failing to hold that plaintiff was an invitee on defendant's premises because there was benefit to defendant in having plaintiff load hay into the barn that was to be used by defendant in feeding cattle shipped by it, and (3) in failing to find that the Anderson Cattle Company employees, of which plaintiff was one, had been on defendant's property sufficiently in the past so that defendant knew or should have known the boys and plaintiff were in the area of the hay barn and on defendant's premises sufficiently to become licensees and therefore entitled to due care.

It is argued the facts of record establish that plaintiff was on defendant's tracks by virtue of an express or implied invitation—and thus occupied the status of a business invitee or licensee and, therefore, defendant was under the duty to exercise reasonable and ordinary care for his safety. In support of this argument he refers to K. S. A. 66-234, which provides—

"That railroads in this state shall be liable for all damages done to person or property, when done in consequence of any neglect on the part of the railroad companies."

and to *Kinney v. Atchison, Topeka & S. F. Rly. Co.*, 193 Kan. 223, 392 P. 2d 873, and *Fleming v. Brown*, 150 F. 2d 801 (cited in the *Kinney* case), both of which discuss the application of the statute.

The facts of those cases, however, clearly distinguish them from the instant case. In the *Kinney* case a woman was injured as a result of slipping and falling on a slick spot on the floor of the public waiting room in the depot of defendant railway. In the *Fleming* case a boy was in a vehicle which was parked in a depot parking area. He was killed when a train jumped the track at the depot. In neither case was the injured party found to be a trespasser, and it was held that under the facts and circumstances the applicable degree of care under the statute and law was that of reasonable and ordinary care on the part of the railway company.

Further discussion of the mentioned contentions is unnecessary. Under the undisputed evidence it is clear that at the time and place in question plaintiff was a trespasser on the tracks of defendant. That being the case, the applicable degree of care owed by defendant was to refrain from willfully and wantonly injuring him, and the trial court was correct in so concluding.

Finally, it is contended that even though plaintiff was a trespasser or licensee, the trial court erred in failing to find there was an issue of negligence to be tried—because defendant's negligence was "active" after plaintiff was on the premises and therefore its duty to him was that of due care.

This contention likewise is covered and answered in the decision of the trial court—and correctly so. This is not a situation where the presence of a licensee is known or reasonably could have been known—and notwithstanding, the owner of the premises thereafter is affirmatively and actively guilty of negligence causing injury.

Under the undisputed facts of this case the trial court reached a correct decision. No error has been shown. The judgment is affirmed.